Next case is 5-13-163 Butler v. Harris. Counselor, ready? You may please support. My name is Natalie Lorenz and I represent Mark Harris. He was a defendant of the trial. I'll remind you that we're recording, so try and speak up a little bit. I don't know how well that works. Okay, I represent Mark Harris, who was the defendant at the trial court level. He is the appellant and the cross-appellee in this case. This case involves two claims. There's a common law fraud claim and a residential real property disclosure act claim. The plaintiffs in this case claim that the defendants, who were Mark and Lisa Harris, Lisa is now Lisa Bone and Steel, that they sold the house in 2008 with knowledge of septic system problems. First, I'd like to discuss the facts of the case, just review them for you. Then I will show you why the trial court erred in holding that the defendants violated the disclosure act statute. And then finally, assuming arguendo that the defendants did violate the disclosure act, I'll go into why the trial court's measure of damages was in fact proper in this case. First, as to the facts, the plaintiffs were interested in buying the defendants' home, like I said, in 2008. They took a tour and Lisa, one of the defendants, told the plaintiffs that there was no problems with the septic system. Then negotiation started. Those occurred in August of 2008. The defendants provided the plaintiffs with a real estate disclosure form where the defendants indicated that they knew of no defects in the septic system other than that the ejector pump had backed up once before. The butlers, the plaintiffs, whenever negotiating the purchase price of the home, provided what they called a problem sheet in the trial court level, and it listed issues that the butlers saw with the property and the estimated repair costs for those issues. One of the issues listed is septic system has a zero next to it and unknown cost next to it. Before the closing took place, there was a septic system inspection at the request of the plaintiffs and at their direction, and that occurred in September of 2008. That inspection revealed no major issues. The form that the inspector gave back to the butlers says, looks okay, inlet line open, water level good, et cetera, et cetera. At the very end, it says discharge open. Discharge area may need new rock at some point. The closing occurred in October of 2008 after this inspection had been done at the direction of the plaintiffs. Then in May of 2009, Mr. Butler, one of the plaintiffs, worked on the septic system slash common road area between his house and a neighbor's house. That caused the neighbor to complain to Madison County because there was effluent draining onto her property from what was the butler's property at the time. The Madison County inspector came and looked at the property, and he said there was recently work done to the common road septic system area. The inspector said that the discharge was buried in rock, and so no free flow was allowed. Sometime between September 2008, when the inspector that the plaintiffs hired said discharge open on that sheet, and May 2009, when the Madison County inspector came and said rock's covering the discharge, something happened so that rock was covering the discharge. It happened after the house was sold. Multiple neighbors testified in this case that there were never problems with the septic system while the defendants were living in the home. In fact, none of the neighbors, even those called by the plaintiffs, testified in their favor on that issue. The butlers did hire Phillip McDowell to fix the septic system in August 2009, so that was several months after it was May 2009, whenever he did the work on the area. McDowell said that he smelled the system due to the discharge pipe being covered by the rock again. And Mr. McDowell said that the defendants should have known of the defects with the septic system because of the fact that it smelled and there were rocks covering it. But as established before, on the sheet that the plaintiff's inspector filled out, it said discharge open and mentioned nothing about rocks covering anything. It said new rock may be needed at some point, nothing about rocks covering the discharge area. So given these facts, it should be clear that the trial court erred in holding that the defendants violated the Disclosure Act. There's actually two reasons for this. First, the trial court applied the wrong standard of proof to determine whether there was violation of the Disclosure Act. And then second, the trial court failed to exercise the discretion with which it was vested to apply the law to the facts with regard to the Disclosure Act claim. First, as to the wrong standard of proof, just as a side note, this is reviewed de novo by the court. So unlike in the case that you just heard where you didn't have discretion to review and decide as you would, if you were sitting at the trial court, this is completely different. You are given the authority to do that. So in this case, the preponderance of the evidence standard was used to determine whether there was violation of the Disclosure Act. It is our position that the clear and convincing evidence standard, just like a common law fraud, should be used. The trial court specifically referenced a First District case in its opinion. It's called Calhoun, and that case is unreported. The trial court said that it was acknowledging that that case held that the clear and convincing evidence would be the proper standard, but that it was declining to follow that case. The trial court held that the preponderance of the evidence standard was proper because that's what was used in Consumer Fraud Act cases. And it's our position that the trial court's holding on that issue was wrong. The Consumer Fraud Act uses preponderance of the evidence because the Consumer Fraud Act, one, does not set forth the standard, and two, says it is to be liberally construed. That's what the Avery case out of the Illinois Supreme Court says. Two reasons why you would use the preponderance of the evidence standard for that statute. Here, the only similarity in the statutes is that no standard is set forth. The Disclosure Act says nothing about being liberally construed. These are two different statutes aimed at two different groups of people. The Illinois courts make clear that individual home sellers are not subject to liability under the Consumer Fraud Act. And further, it's clear that not all statutes that are aimed at preventing fraud use the preponderance of the evidence standard. So, for example, clear and convincing evidence is a standard to prove fraud under Section 443 of the Retailer's Occupation Tax Act. So not all statutes that are aimed at fraud use a different standard than in common law. Statutes are further supposed to change the common law only to the extent that their terms warrant. There's, again, nothing in the Disclosure Act saying that a lower standard should be used. And further, there's case law saying that the Disclosure Act was based on common law fraud, and that, of course, militates in favor of using the same standard as was used in common law. And that would be clear and convincing evidence. The plaintiffs have cited a couple of cases trying to show that the preponderance of the evidence standard should be used. And there's no mention of any standard of proof in those cases. There's nothing in the Curtis case. There's no mention of standard of proof to be applied by the trial court. However, the appellate court noted that the facts before the trial court weren't overwhelming, but that due to the standard of review, not the standard of proof, they couldn't say that the trial court acted against the manifest weight of the evidence. And again, the Avery case, also cited by the plaintiffs, holds what standard of proof should be applied in Consumer Fraud Act cases. So that's, again, as mentioned before, it's a completely different statute. You can get a different set of people. So in conclusion, the clear and convincing evidence standard should have been applied in this case, and therefore the trial court should be reversed on the Disclosure Act portion of its decision. Further, even if you apply the preponderance of the evidence standard, it's clear in this case that there was an arbitrary ruling made. It was not based on the evidence in the record, and therefore was against the manifest weight of the evidence. The trial court's opinion, if you read it, it first addresses the common law fraud claim, and then it goes into the Disclosure Act. The trial court stated in the Disclosure Act part, plaintiffs proved their Disclosure Act case to an extent assuming preponderance standard. It's not clear what the court meant by to an extent. It seems to me that it indicates the court was not completely sure of its decision. And again, we would put forth that they were applying the wrong standard of proof, whenever they said assuming preponderance standard. In any case, there's not sufficient evidence to uphold that decision. There was no analysis of facts. There was no analysis of elements with regard to the Disclosure Act claim. What appeared to happen was that once the court determined that the lower standard of proof applied with respect to the Disclosure Act rather than the common law, the plaintiffs automatically get to win. That seemed to be the reasoning. And the court didn't even consider the facts that it had just before analyzed with respect to common law fraud. The only evidence that I can find in the record that would support anything as far as the Disclosure Act claim would be that McDowell's testimony where he said that they should have known there was problems because of the smell and the rocks covering. But as we established just before, whenever I was reviewing the facts, the inspector that the plaintiffs hired right before the house was sold said discharge open and rock may be needed at discharge area. Nothing about rocks covering the discharge area. And the trial court indicated, in fact, that the defendants most likely did not have knowledge of any septic system problems. First, the trial court noted that all of the neighbors who testified testified favorably for the defendants on this issue. And the trial court also noted, quote, if the system looked good to an expert, it worked against the plaintiff's case that defendants without expertise must have known it not to be good. So the trial court was saying you had an inspection done before the property was sold and the inspector found nothing. How should the defendants know anything was there? And again, the trial court said that with respect to the common law claim, and then automatically, because the lower standard of proof was applied for the Disclosure Act claim, just disregarded that earlier statement. So in conclusion, the trial court's decision regarding the violation of the Disclosure Act was not based on the evidence before it. It was based on a snap judgment that because this lower standard of proof applied, the plaintiff should automatically win. Moving on to the cross appeal in this case, it has to do with the measure of damages. So this is assuming that the defendants did violate the Disclosure Act. The question then is whether the measure of damages that were awarded to the plaintiffs was proper. And we would put forth that they were proper, assuming again that the defendants actually did violate the Disclosure Act. The trial court correctly awarded only a portion of the damages. There was a lengthy discussion in the trial court's reasoning regarding damages. It was based on case law. The case law was actually cited in the opinion. Basically, it's the Woods case, which says that damages can be limited if the buyer is aware of defects. So the reasoning is that the buyer's knowledge of defects is reflected in the purchase price, and the buyer is given the benefit of his bargain on the front end with the purchase price rather than on the back end with damages. So he gets the benefit of his bargain, but nothing more than that. And in this case, the trial court noted that the butlers did use their knowledge in negotiations with that problem list. Now, it is true, and I'm sure the plaintiffs will bring this up, that the problem list didn't actually state a cost. It said zero unknown costs next to septic system. But there's more than one way to negotiate. You don't have to necessarily take a number down, subtract a number, in order to use the septic system as a negotiation tool. What I see it as is they were trying to make their offer sound reasonable by listing things but not deducting for them. So the other deductions, they can say, oh, well, you know, those were fine because we didn't deduct for this over here. So, I mean, it doesn't necessarily have to be that you actually reduce the number for that specific problem. The trial court also noted in its decision regarding damages that the plaintiffs were not credible regarding their damages statements. For example, post-trial, the plaintiff's attorney said that the plaintiffs used their knowledge of the septic system issues as a negotiation tool because they thought they needed to hook up to the city, not fix the septic tank itself. And the trial court found that not credible. And again, that's another, they're admitting there that it's a negotiation tool that they used not necessarily to reduce the price in that of itself, but as a piece of the puzzle. The plaintiffs are also arguing that the trial court disregarded uncontroverted evidence of damages. This is simply not the case. The trial court had evidence of damages before it, but then it also had additional evidence that the plaintiff knew of the defects. And that is, per Woods, a reason to reduce those damages. They didn't disregard it. They had additional evidence. So that, in conclusion, that would be why the trial court correctly awarded only a portion of the damages in this case. Moving on to attorney's fees, again, it is our position that the trial court correctly awarded only a portion of those fees. The plaintiffs set forth a myriad of arguments in their brief regarding why the attorney's fees should not have been reduced to less than their full amount. And so I'll try to address as many as I can with the time I have left here. First is a stipulation argument. The defendants or the plaintiffs are arguing that the defendants stipulated that the attorney's fees in this case were reasonable. And that's just simply not the case. If you look at the record, Mr. David Cruzwell was the trial court attorney in this case, and he specifically states on the record that he is stipulating that the amount of fees were actually incurred in that case, not that they were reasonable. What he was trying to do is save the attorneys from having to come on the stand and say, I worked X amount of hours, it was worth this amount of money. That is all he was trying to do. And I think the record makes that extremely clear if you just read it. I think it's page four or five of the transcript. The next argument that they make is that there was an inadequate percentage of fees awarded. They're saying that because less than half of the fees requested were awarded, it's so inadequate that it's an abuse of discretion. They're citing the Kirkpatrick case for that proposition. And that case simply doesn't say that. In that case, 70% of the fees requested were awarded because the attorney spent 70% of his time on the consumer fraud act claim that was at issue in that case. The case has nothing to do with the argument that less than half of the fees requested is an abuse of discretion. And really, if you were to put a rule out there that less than half of the fees is abuse of discretion, that would only make people request more fees. It wouldn't make any sense because it would just give people incentive to ask for more. That way they can get at least half. Next, the plaintiffs make a penalization argument. They argue that they shouldn't be penalized due to the fact that an appeal took place. In this case, not this appeal. There was actually a prior appeal. The trial court actually specifically addressed this in its opinion. It said that the appeal only accounted for so much of the fee in this case. So basically what the trial court was saying was that the fees were too much, even considering that an appeal took place. The next argument that the plaintiffs make is that there should be no reduction for unsuccessful claims. They're arguing that there may have been a reduction in this case due to the fact that they did not prevail on the common law fraud claim. First, there's nothing in the record, nothing in the opinion that I found indicating that there was a reduction in this manner at all. But in any case, the plaintiffs could not have recovered for the common law fraud claim even if they had prevailed on it. And there's case law to that effect. The general rule, of course, is that there's no recovery of attorney's fees for unsuccessful claims. That's the GlobalCom case that's cited in my brief. The exception to that, of course, is the Common Core Effects Doctrine, and that's what the plaintiffs are arguing. And that's cited in my brief under the France case. And then basically the Common Core Effects Doctrine is – basically says that – did I finish my thought? The Common Core Effects Doctrine says that you can't get fees for the claims that you were not successful on unless that you can't delineate the attorney's time very well. If it's not clear what the attorney spent their time on, some time was mixed between the two different claims, you can recover for both of them, the attorney's fees. There is also an exception to that exception, though, where you can't use the Common Core Effects Doctrine as a sword to get fees for claims when no fees are authorized for that type of claim. Do you have time on your rebuttal? Yes, Mr. Peters, please. Thank you. Don't break it. It's not as old as the chair. I better not touch anything. It'll fall apart if I touch it. Thank you. If you'll please support, my name is Tom Berker, and I represent the plaintiffs in the present case. Attached to the appellant's brief is an appendix which contains this photo. I don't know if you would like to turn to it. I realize it's being recorded, so I have to stay close to the mic, but this kind of lays out what the lay of the land is there. I'm going to use this chalkboard and talk out of it. Just demonstrate briefly what we have. Counselor, do you want to move around? I see you, that's fine. Okay. This is an appellant's chair. It's got a walk-out basement. There's a retaining wall, as you can see in that photo. Okay. And here's the road that leads to the tennis court. And over here is Tina's property. Okay. The center area is in this area. The appellant falls out down to here. Is there any setback on the overflow? Some cities have a setback on their overflow. Is there a setback in this case? The setback was 10 feet from the property line. And that's a common... This is the property line. Oh, that's... Okay. Now, there is a walking path that goes through here that's like a common easement type for the subdivision. Okay. So basically, the complaint from the zoning administration or the city official was that this pipe was not 10 feet off of this property. And it actually should be. Right. Anyway, I just want to show you the layout so that you can understand what's going on. The complaint was that this is a walkout basement with a door right here. Okay. And frankly, there was all sorts of evidence. We talk about lack of evidence here. There was all sorts of evidence from the experts with regards to how the drainage down here would come in and affect the flooding into the basement. So that was one of the chief complaints of what happened in this case. But it wasn't revealed. There were two, not just one. It wasn't just the sewer. There were two subdivisions. One was the sewer. The court recognized that in this court. And the second one was the infiltration of water into the basement. Now, the court didn't report any damages for the infiltration of water into the basement because we didn't have any. We – the plaintiff's son repaired the doorway but didn't keep it in the seats of the woodies. And we basically – well, water came in, we vacuumed it out, and there was no other damage to the basement. So if you look at the court's order and the entire transfer, that's why the judge did what he did with regard to the water infiltration. He did not rule that it did not occur. In fact, he comments – and I'll go over that debate in a minute with some of the stuff I'm going to read – about the fact that the plaintiffs, as soon as they got in the house, couldn't run their washer without a flood. So this is the layout. I wanted to demonstrate that so that you all can understand. No evidence in the case that shows that the Harris's knew what was going on. The Tennis – I don't think it's Telstra, but the Tennis – I hope I'm pronouncing it right – built their house after the Harris's were living there. The Harris's lived there six years prior to selling the property. All of this water that we have, this issue of water coming out, comes right to a point right here. And the reason I'm pointing the picture is what shows in the picture where they dug it out. When they built their house, which lays down in a valley of banyan trees, that's what's right here. A major drain, so as to absorb all the afternoon from that. Where does that go? Pardon me? You're saying a drain? A drain that takes it out underneath or around the Tennis's house to a creek behind. And the Tennis put that – built that drain? He put that elaborate drain system, and that's referred to in the record. There's an elaborate drain system that they had to put in to absorb all the water and afternoon that was coming right to that point. Right to where you saw in that – shows in that picture. Okay? So in this picture, it actually is right there. Okay? So we have to show facts of what happened here. They say there's no evidence that the Harris's knew. It's simply not true. There was. Now let's get down to the legal standards to be applied here. I think what's lost is the fact that the court found that there was a representation that was made. The representation turned out to be false, and almost every element of fraud was proven in this case except the problem of reliance. Now, I disagree with the court, but I don't think it's against the manifest way of the evidence. The defendant suggests that the – we somehow apply a different standard. I think the standard we need to worry about is whether or not the trial court's ultimate result is sustainable by the evidence that's in the record. And it is. My response to their suggestion that you need some groundbreaking decision that in real poverty disclosure act cases, the burden of proof is more than a preponderance and a – should be the clear and convincing standard that's applied to a fraud case is twofold. Number one, the preponderance of the evidence case standard is the correct standard to apply. It is applied to consumer fraud cases, and although the defense tries to distinguish consumer fraud cases from the deceptive practices – or the real estate – residential real property disclosure act cases, I think they fall short. They're both designed to protect consumers, one, the consumers of homes, and they're both designed to make sure people know what they're getting into. Okay? So therefore, I think the trial court was correct in applying the standard, but I don't think you have to get to that. Now, if you want to, go ahead, but I think that you don't have to get to that because there's enough evidence in the case to even win under the higher standard of the clear and convincing. But let's see – they try and quote an unpublished decision. Let's go to a published decision, the Curtis v. Shoes case that's cited. First, let me read what – some of the evidence. It was established that the Harris's lived in the house for over six years. That's at R143. And fill me down. The defense counsel touched on that a little bit. And the court basically relied heavily on his testimony. And he basically said that because of what he saw – and oh, by the way, the documentary, the pictures that are there in the record, you've got to look at those because they show all the work that Phil McDowell did. I mean, he got into the guts of this system. And when he did, he could tell, no, this system was broken. It hadn't been maintained for years. These people knew is what he basically said. Was he in the laterals or just in the main tank? He was in the – look, he was in the main tank. But his testimony was, and the court even – I'm going to read the court's opinion on it. I'll do it right now. From the court's order, the court reasoned that Mr. McDowell, plaintiff's separate system specialist, was better. His opinion is that the previous owners would have known, not should have known, but would have known the problems of smell and discharge, and this was presented in a credible manner. And he goes on to say the defendant's theory, or one of them, is that the plaintiff's changed the outflow prior to the involvement of Hearst, which resulted in problems plaintiffs experienced in which defendants claim they did not experience. The same argument being made here because we put rock over the outflow. But it was rock. Water flow goes through rock. In any event, the court says, and I'm quoting from the decision, the defendants do not explain why the plaintiffs would have chosen to do work on a separate system so soon after their purchase if there were no problems in it, as it is not intrinsically charming or rewarding work. And since the plaintiffs did the work when they did, it argues for the condition giving rise to the need for the work predating their ownership. Was there any kind of suit filed against the inspector that was hired by the plaintiffs? No. Because of the laterals who weren't doing their job? No. See, if a lateral does its job, I don't think there's any other reason on outflow. I agree 100%. The only explanation I'll offer to that is I got a case late in the statute of limitations. Oh, ran on that. Okay. So I agree 100%, but that was not a possibility. So we have all these factors. Let me go through some of the other factors here. Let's see. He testified, McDowell did, that this just doesn't happen overnight. That's a quote from the record in R383. So there was plenty. Oh, and the other thing that the judge was taken with, this came out during oral arguments, too. One of the neighbors who lived two doors down from the Butler's would walk this walkway, and he said basically that the sequence of ownership was the Frederick's, the Harris's, and then my client's. When the Frederick's lived there, he smelled the odors. And one of the observations that Judge Chapman made when he was there, he says, it doesn't make sense, and he challenged Mr. Gooswell up front, can you explain that, why the Frederick's has problems but then the Harris's don't? And then as soon as my clients get a hold of the property, boom, there's problems. That didn't make sense. So there's plenty of evidence in this case to show by a clear and convincing standard of law if you want to go there. But I think that some of these cases, the recording case of this Curtis case, doesn't have to go there, doesn't go there because it said, and I'll quote this from the Curtis case here, the record is in the present case is scant. Robert Schutz denied any knowledge that the water supply line in the residence or the interior system was faulty. However, he admitted that he had residential water supply turned off at the curb box rather than the meter inside the house. That's it. That's all the evidence was there. The court states, we recognize that the evidence that the Schultz's knew a problem existed is less than overwhelming. However, we cannot say that an opposite conclusion to that reached by the trial court is clearly evident. We therefore affirm the trial court's finding that the Schultz's had knowledge of the defect at the time of the claim. And that's where I was getting to when I started out. The issue isn't what standard to apply, whether it's clear and convincing or from ponderance of the evidence. The issue is whether there was enough evidence there. Their standard is to prove that it's against the manifest way of the evidence. And frankly, it's not. Just like Curtis, this court should affirm that ruling in the trial court that there was evidence that the Harris's knew. Now, turning back to the judge's decision in this case, and I thought, you know, after rereading the appellant's brief in the case, I thought one of the things they're missing here. In fact, I made a note of it before I did it, right? Yeah. One of the things they're missing here is that the whole reason we lost the fraud case, and the only reason I believe, is that the reasonable reliance factor. In fact, the judge, the court judge says in his order, he says, a substantial question here is reasonable reliance in the fraud case. And then he goes on and checks the elements. But all the other elements were met. So I think they missed, they kind of shifted the focus and tried to say, well, you know, there's no evidence of the fact that the Harris's knew, and there is abundant evidence of such in the pictures and everything else. And just the lay of the land and the fact that why would the tenants have to put a frame here if there wasn't, in fact, problems? And they built while the Harris's owned the property. Okay. Let me see if there's any. I won't address the issue that the court did not like my forensic expert, but I thought he was credible. But the judge said otherwise, and I know that's not grounds for changing the court's decision. So I'll move on from that. I guess what I'll do now is address the fee issue, our counter, our cross-appeal. This court in J.D. Esker addressed an issue with regard to a contract fee shifting case where the contract provided that the prevailing party would have their fees paid. I think that's a compelling case in our case. While it's distinguishable sort of because it's a contract fee shifting, the statute in this case, the statutes and contracts are construed the same way, is also a fee shifting. The defendant can get paid fees if they're the prevailing party in a real property disclosure act case. And, in fact, the defendant's counsel petitioned for fees in this case. And that's why I suggest that Judge Chapman's decision to not award all the attorney's fees that were presented was an error. I presented a detailed affidavit of the work that I did in the case. All of it was in there. And his counsel just stipulated. There was a stipulation at the trial by defense counsel that, yes, all those hours were put in, and, yes, they were all necessary. He just didn't stipulate to the reasonableness of the fee. Okay? Well, that's not the basis of Judge Chapman's decision. Judge Chapman didn't say $225 is too high. I'm going to give you $150. He didn't really give a basis for deciding his fee. And his opinion gets a little confusing, and I had trouble with it. And I put down something to ask counsel about counsel for the defendants basically says that the trial court only awarded a portion of the damages that were proved. I don't know how she gets that. Because although the decision is confusing, Judge Chapman refers to the Woods v. Pence case and makes sure that it's known that the difference between the statutory case and the common law case is you don't have to have reliance in the real property disclosure act case. And he got that right because that's right out of Woods v. Pence. But then he also says that might go to damages, but then he doesn't delineate. Okay. In the beginning of his opinion, he delineates exactly what it is. He says that there's a $3,275 repair bill, a $250 report fee, and then $32,000 in attorney's fees. From the beginning, from the beginning, he was upset with the fact that this case wouldn't settle because the parties were at loggerheads and it caused the attorney's fees to go through the roof. Well, now it sets a new record. I think it is. I think we talked about – I don't want to say so for sure, but I think we talked about that during the openings. I think. I may be wrong. But in any event, that's not a good basis, and I don't think – I think Jane B. Esker says that that's not a good basis for denying somebody the time that's necessary to do the case. Now, I want to draw the court's attention to the history of this case, okay, and trying to focus on what happened. This isn't the first time this court has had this case. Let's take a look at what Mr. Harris's actions in this case speak of. I think they speak – this particular action speaks louder. His separated wife – in the first case, the first appeal, his separated wife comes to the – asks for a continuance because of medical problems, and so the butlers don't show up. And Mr. Harris does show up and obtains a default order. Now, I have to presume he knew of what had gone on, and I presume that that was deliberate. And what did it do? It caused us to have to go through the appellate process, incur additional attorney's fees, and basically keep – try to keep going in the case just to get justice over a $4,000 bill. But he wasn't going to let that happen. He still isn't going to let it happen. He's not even satisfied with the $12,000. He appealed it. I think under the circumstances, enough here for the court to conclude that it's Mr. Harris that's causing the increase in attorney's fees here. And I do believe it was an abuse of discretion not to award all of the attorney's fees. Kirkpatrick, counsel for – appellate counsel for the defendant referred to the Kirkpatrick case. And that case was cited because there was $83,000 in attorney's fees, all very well documented. May I finish the thought? And there was only $400 in damages. There were four plaintiffs, $100 apiece in nominal damages. Yet the court affirmed an award of $83,000. We have all the cases cited. We'll take your presentation. Thank you. Thank you for your attention. The case will be closed. May it please the court, I want to address some of the arguments made by opposing counsel here. First, he's talking about drawing this diagram and talking about basement flooding. If you look at the complaint, there was nothing mentioned about basement flooding as a reason for the Disclosure Act violation or common law fraud violation. The amendment was done, if I recall correctly, it was either right before trial or right after trial to include basement flooding in there. I don't believe that's an issue in this case. Right. And that's my point with this diagram. All that's being diagrammed is the fact that the neighbor's property got flooded from time to time. And if you look in the record, I think it's around page 418 or so, the neighbor, who's Ms. Tanya's, she's saying that whenever they built that house, they knew what they were getting into. And she uses those exact words as far as drainage, as far as the flooding and the needing of the system on the property. That has nothing to do with the septic system that defendants had at their home at that time. It has nothing to do with that. So I don't understand the diagram and what they're talking about as far as that goes. Now, the Curtis case, that is cited by plaintiffs regarding the standard of proof that should be applied in disclosure act cases. Again, the Curtis case says nothing about the standard of proof to be applied. It was affirmed. I'm sorry. On appeal, the court said, well, there's nothing that we can see in here that would show that it's against the manifest weight of the evidence. So basically, it was a case decided based on the standard of review. There's nothing about a standard of proof at the trial court level mentioned anywhere in there. Next, there was some discussion about the fact that I brought up rock not covering the discharge at one point and then rock covering the discharge at another point. Counsel was saying, you know, water goes through rock. That shouldn't be a problem. That's not what Mr. McDowell said. That is not what plaintiff's own expert said. The expert said that the reason that defendants should have no of the septic system issues was because there was rock covering the pipe, the discharge area, and that caused it to smell. That's what the expert said. The rock wasn't there before they sold the property. So it doesn't really make sense to say, well, water goes through rock. I mean, does it make any difference? Because if it smells, the laterals aren't working. Isn't that their argument? I think their argument, what Mr. McDowell was saying, was that it smelled because the rock was there. That's what's in the record.  If you look at Mr. McDowell's testimony, and I quote it actually in my brief if you don't want to have to go through it all. It says the reason that they should have known was because there was rock covering the drain pipe, and it smelled because there was rock covering the drain pipe. And as we know from the inspection sheet, the discharge was open right before they sold the house. And then the other matter that was quoted from Mr. McDowell, he was saying that this doesn't happen overnight. Well, it was actually three months between May and August whenever Mr. McDowell was fixing the property. And further, it was almost a year between the time the house was sold. It was like ten months between the time the house was sold and the time that he was fixing the septic system. And in those months, Mr. Butler had done some work on the property. I'm not sure, you know, I'm not an expert in septic systems, but there was clearly some work done. And those photos that he was talking about, those are the work that was done by Mr. Butler in May of 2009. Next, opposing counsel talks about the trial court's opinion. The trial court's saying that as far as common law fraud, all the elements except for reliance were met.  Nowhere does it say all elements were met. The court doesn't really talk about whether the defendants for sure knew or did not know. He just sort of sets out facts, but he doesn't really come to a conclusion as far as the knowledge issue. And it is suggested by the opinion, although never concluded, because- We'll read the briefs and look at the record. The court will stand in recess shortly.